**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

In re:

                                              **CASE NO. 06-21217**

**JAMES M. GRANT and**
**SHANE M. GRANT,**                           **DECISION & ORDER**
                          Debtors.

_____

## BACKGROUND

On July 13, 2006, James M. and Shane M. Grant (the "Debtors")
filed a petition initiating a Chapter 13 case, and George M.
Reiber, Esq. (the "Trustee") was appointed as their Chapter 13
Trustee.

The Debtors filed a Chapter 13 Plan (the "Plan") which
provided, pursuant to that portion of Section 1325(a)(9) that has
become known as the "Hanging Paragraph," that the claim of Eastman
Savings and Loan Federal Credit Union ("ESL"), secured by a 2005
Ford Taurus (the "Taurus"), was to be treated as an allowed secured
claim in the amount of $17,983.00.  This represented the amount the
Debtors believed was due on the "Retail Installment Contract" Shane
Grant entered into when she purchased the Taurus, even though the
Debtors' schedules indicated that they believed that the retail
value of the Taurus was only $14,675.00.  The Plan further provided
that the allowed secured claim of $17,983.00 was to be paid with
interest, in equal monthly installments through the Plan.[1]

---

[1]      On August 15, 2006, ESL filed a secured claim (the "ESL Secured
Claim") in the amount of $17,551.04.

On August 23, 2006, the Trustee filed a Motion (the "Valuation Motion") which requested that the Court, pursuant to Section 506(a)(1), determine that ESL had an allowed secured claim for the $13,475.00 August NADA Guide retail value of the Taurus and an unsecured claim for the balance of the ESL Secured Claim.  The Valuation Motion asserted that:  (1) the Debtor, Shane Grant, purchased the then-used Taurus on May 4, 2005 for her personal use from Webster Ford, Inc. ("Webster Ford"), which was within 910 days of the filing of their petition; (2) in connection with her purchase, she traded in a 2004 Ford Suburban Freestar (the "Freestar"), which was valued at $23,911.00 on the Retail Installment Contract[2]; (3) at the time she traded in the Freestar, it was subject to a lien in favor of ESL that was owed $22,061.00; (4) the May 2005 NADA Guide indicated that the Freestar had a trade-in value of $16,175.00; (5) the Retail Installment Contract indicated that the cash price for the Taurus was $22,995.00, even though the July 2005 NADA Guide indicated that the manufacturer's suggested retail price for a new Taurus, rather than the used Taurus Shane Grant purchased, was $20,485.00; (6) the combination of the marked-up trade-in allowance for the Freestar and the marked-up sale price for the used Taurus indicated that the Debtor, Shane Grant, had substantial negative equity in the Freestar that

---

[2]     The Retail Installment Contract was later assigned to ESL.

was refinanced as one of the transactions evidenced by the Retail

Installment Contract so that the amount due to ESL could be paid

and a lien release obtained; (7) although the Retail Installment

Contract granted the holder a security interest in the Taurus for

the entire amount financed, because the ESL Secured Claim included

rolled-in and refinanced debt, ESL did not have a purchase money

security interest for that portion of the debt, and, therefore, for

all of the debt included in the ESL Secured Claim, as specifically

required by the Section 1325(a)(9) Hanging Paragraph; and (8)

because ESL had a purchase money security interest for only a

portion and not all of the debt included in the ESL Secured Claim,

the exception set forth in the Section 1325(a)(9) Hanging Paragraph

did not apply, and the ESL Secured Claim was subject to the cram-

down and bifurcation provisions of Section 506(a)(1).[3]

---

[3]        Section 506 provides, in part, that:

(a)(1)  An allowed claim of a creditor secured by a lien
on property in which the estate has an interest, or that
is subject to setoff under section 553 of this title, is
a secured claim to the extent of the value of such
creditor's interest in the estate's interest in such
property, or to the extent of the amount subject to
setoff, as the case may be, and is an unsecured claim to
the extent that the value of such creditor's interest or
the amount so subject to setoff is less than the amount
of such allowed claim.  Such value shall be determined
in light of the purpose of the valuation and of the
proposed disposition or use of such property, and in
conjunction with any hearing on such disposition or use
or on a plan affecting such creditor's interest.

11 U.S.C. § 506 (2006).

**Page 3**

On September 8, 2006, ESL filed Opposition to the Valuation Motion, which asserted that when purchased the Taurus had a book value of $21,433.50, although it did not indicate what guide was used.

The Trustee filed similar valuation motions in other Chapter 13 cases involving secured claims filed by a number of other motor vehicle financers (these creditors, along with ESL, will be referred to collectively as the "Motor Vehicle Finance Group").[4]

The Court conducted hearings on September 13, 2006 and November 15, 2006 at which time it heard the oral arguments of the Trustee and attorneys for a number of the Motor Vehicle Finance Group, including the attorneys for ESL.

On December 22, 2006, the Court issued a Decision & Order in *In re Peaslee*, 2006 WL 3759476, Bkrtcy. W.D.N.Y., December 22, 2006 (No. 06-21200) ("*Peaslee*"). In *Peaslee*, a copy of which is attached, the Court found that Section 506(a)(1), rather than the Section 1325(a)(9) Hanging Paragraph, governs the treatment of the secured claim of a motor vehicle financer, even though the debtor has purchased a replacement motor vehicle within 910 days of the filing of their petition for personal use, where: (1) it is shown

---

[4] The Trustee initially filed objections to confirmation in the cases where he believed that because of the roll-in and refinance of negative equity, the Section 1325(a)(9) Hanging Paragraph did not apply, even though the respective debtor's plan provided for treatment of the secured claim under the Section 1325(a)(9) Hanging Paragraph. It was at the Court's suggestion that the Trustee filed the valuation motions in order to insure that the respective members of the Motor Vehicle Finance Group received clear and detailed notice of the Trustee's position and so the motions could then be set down for consolidated oral arguments.

that the secured claim includes amounts loaned to the debtor to pay off the debtor's negative equity in a trade-in vehicle, not to pay any part of the actual purchase price of the replacement vehicle, so that not all of the debt included in the secured claim is secured by a purchase money security interest; and (2) the Court, on all of the facts and circumstances presented in these refinancing of negative equity cases, in the exercise of its discretion, as specifically provided for by Section 9-103(h) of the New York Uniform Commercial Code, determined that a transformation rather than a dual status rule would be in the best interests of all of the parties and the Bankruptcy System.

On January 10, 2007, the Court issued a Decision & Order in *In re Jackson*, 2007 WL 63582, Bkrtcy. W.D.N.Y., January 10, 2007 (No. 06-21044) ("*Jackson*").  In *Jackson*, a copy of which is attached, the Court found that:  (1) where the applicable retail installment contract did not itself indicate that negative equity had been refinanced, any interested party objecting to a motor vehicle financer's secured claim receiving treatment under that Section 1325(a)(9) Hanging Paragraph had the initial burden to demonstrate that the secured claim included debt that was not secured by a purchase money security interest; (2) the objecting party could utilize the appropriate NADA Guide value to meet their initial burden of proof as to the trade-in value of a trade-in vehicle, the retail value of a used replacement vehicle, or manufacturer's

suggested retail price of a new replacement vehicle; (3) notwithstanding a determination by the Court that an interested party using NADA Guide values may have met their initial burden of proof to demonstrate the refinancing of negative equity, so that a motor vehicle financer's secured claim included debt that was not secured by a purchase money security interest, the motor vehicle financer always retained the right to demonstrate that in fact no negative equity in the trade-in vehicle was refinanced and to request a hearing for the Court to make that determination; and (4) in the event the Court determined that the allowed secured claim of a motor vehicle financer was to be treated under Section 506(a)(1), the motor vehicle financer always retained the right to dispute any alleged retail value for the vehicle in question, and to request a hearing for the Court to determine the actual retail value.[5]

## DISCUSSION

In this case, the Court finds that the Trustee has met his initial burden of proof to demonstrate to the Court's satisfaction that the two separate financial transactions evidenced by the applicable Retail Installment Contract included the separate transaction where Webster Ford loaned the Debtor, Shane Grant,

---

[5] These findings, numbered (3) and (4), were primarily to address the Court's determinations in the ten other cases it had on reserve when *Peaslee* and *Jackson* were decided, including this case. *Jackson* also indicated that in the future these refinancing of negative equity cases would be addressed in connection with objections to confirmation when any response by a motor vehicle financer should address whether it requests a hearing on negative equity or retail value.

**Page 6**

money to refinance the negative equity she had in the Freestar for the following reasons:

1.  Webster Ford gave the Debtor, Shane Grant, a $23,911.00 allowance for the Freestar, even though the NADA Guide trade-in value for the Freestar was only $16,175.00;

2.  Even though the $23,922.00 allowance for the Freestar may have been within the range of the values that resulted in the NADA Guide trade-in value of $16,175.00, although that seems unlikely, the Debtor, Shane Grant, paid more than $22,995.00 for the used Taurus replacement vehicle that had a manufacturer's suggested retail price of approximately $20,485.00 for a new Taurus; and

3.  The overall price paid by the Debtor, Shane Grant, for the Taurus indicates that she in fact had significant negative equity in the Freestar.

## CONCLUSION

Subject to the right of ESL to request a hearing by February 20, 2007 on the issues of whether negative equity was refinanced or to determine the retail value of the Taurus, for the reasons set forth in *Peaslee*[6] and *Jackson*, pursuant to Section 506(a)(1), ESL shall have an allowed secured claim of $13,475.00, reduced by any payments received in the Grant Case, to be paid in

---

[6]    The position and principal arguments asserted by ESL were addressed in *Peaslee*.

equal monthly payments together with the applicable *Till* rate of

interest, to be set forth in the Confirmation Order presented to

the Court by the Trustee, and an unsecured claim for $4,076.00.


      **IT IS SO ORDERED.**


_____/s/_____

**HON. JOHN C. NINFO, II**
**U.S. BANKRUPTCY JUDGE**

**Dated: February 8, 2007**